Case No. 25-70002

# In the United States Court of Appeals for the Fifth Circuit

JASON KELLER,

*Petitioner – Appellant,*

*Versus*

BURL CAIN, Commissioner, Mississippi Department Of Corrections,
LYNN FITCH, Attorney General Of The State Of Mississippi,

*Respondents – Appellees.*

On Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 1:21-CV-134

## BRIEF OF PETITIONER-APPELLANT

Caroline K. Ivanov
(MSB No. 104215)
Watkins & Eager pllc
400 East Capitol Street (39201)
Post Office Box 650
Jackson, Mississippi 39205
Phone: (601) 965-1900
civanov@watkinseager.com

Brandi Denton Gatewood
(MSB No. 103550)
Mississippi Office of capital
Post-Conviction
239 Lamar Street, Suite 404
Jackson, Mississippi 39201
Phone: (601) 359-5733
bgatewood@pcc.state.ms.us

**ORAL ARGUMENT REQUESTED**

**\*\*\*THIS IS A CAPITAL CASE\*\*\***

i

# CERTIFICATE OF INTERESTED PARTIES

Jason Keller
     Appellant

     v.                                Case No. 25-70002

Burl Cain, Commissioner,
Mississippi Department of Corrections,
And Lynn Fitch, Attorney General,
     Appellees

The undersigned counsel of record certifies that the following listed persons as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1. Petitioner/Appellant – Jason Keller

2. Respondents/Appellees – Burl Cain, Commissioner, Mississippi Department of Corrections; and Lynn Fitch, Attorney General of the State of Mississippi

3. Counsel for Respondents – LaDonna C. Holland; Allison Kay Hartman

4. Counsel for Petitioner – Caroline K. Ivanov; Brandi Denton Gatewood

5. Family of Hat Thi Nguyen

s/Caroline K. Ivanov
Attorney of Record for Jason Keller

# STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Federal Rule of Appellate Procedure 34(a), Petitioner-Appellant Jason Keller respectfully requests oral argument for this Court to consider his appeal. This is a capital case. The issue raised is significant and raises serious concerns about validity of Mr. Keller's conviction and sentence. Oral argument will aid the Court in considering whether the only direct evidence of guilt – Mr. Keller's statement to police officers given in the Intensive Care Unit – was voluntarily given.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PARTIES..............................................ii

STATEMENT REGARDING ORAL ARGUMENT .................................iv

TABLE OF AUTHORITIES......................................................................vi

STATEMENT OF JURISDICTION..........................................................1

STATEMENT OF THE ISSUE..................................................................3

STATEMENT OF THE CASE ..................................................................4

SUMMARY OF THE ARGUMENT ........................................................14

ARGUMENT ...........................................................................................16

CONCLUSION .........................................................................................51

SIGNATURE OF COUNSEL..................................................................52

CERTIFICATE OF SERVICE................................................................53

CERTIFICATE OF COMPLIANCE.......................................................54

# TABLE OF AUTHORITIES

## Cases

*Andrew v. White* 145 S. Ct. 75 (2025)....................................................38

*Arizona v. Fulminante*, 499 U.S. 279 (1991) ..........................................50

*Berghius v. Thompkins*, 560 U.S. 370 (2010) .........................................46

*Blackburn v. Alabama*, 361 U.S. 199
(1960) ................................................14, 18, 19, 20, 24, 36, 42, 51

*Blanton v. Quarterman*, 543 F.3d 230 (5th Cir. 2008) ..........................17

*Bobby v. Dixon*, 565 U.S. 23 (2011)........................................................44

*Brecht v. Abrahamson*, 507 U.S. 619 (1993).........................................51

*Brown v. Illinois*, 422 U.S. 590 (1975) ..................................................26

*Bruton v. United States*, 391 U.S. 123 (1968) .......................................50

*Chambers v. Florida*, 309 U.S. 227 (1940).............................................18

*Colorado v. Connelly*, 479 U.S. 157 (1986) .....................................19, 20

*Edwards v. Arizona*, 451 U.S. 477 (1981) ..............................................45

*Fikes v. Alabama*, 352 U.S. 191 (1957)......................... 18, 19, 24, 25, 36

*Illinois v. Allen*, 397 U.S. 337 (1970) ....................................................45

*Jackson v. Denno*, 378 U.S. 368 (1964)..................................................46

*Keller v. Mississippi*, 138 So. 3d 817
(2014) .......................................8, 13, 17, 20, 25, 29, 38, 40, 47, 48

*Keller v. State*, 306 So. 3d 706 (Miss. 2020) ..........................................13

*Lesley v. State*, 606 So. 2d 1084 (Miss. 1992).......................................48

*Michigan v. Tucker*, 417 U.S. 433 (1974)..................................26, 29, 34

*Mincey v. Arizona*, 437 U.S. 385 (1978)................................................46

*Miranda v. Arizona*, 384 U.S. 436 (1964)......................................17, 43

*Missouri v. Seibert*, 542 U.S. 600
(2004) ......................................15, 26, 29, 35, 36, 37, 38, 39, 43, 44

*New Jersey v. Portash*, 440 U.S. 450 (1977)..........................................46

*Oregon v. Elstad*, 470 U.S. 298 (1985)......................................34, 35, 39

*Rogers v. Richmond*, 365 U.S. 534 (1961)..............................................46

*Smith v. Illinois*, 469 U.S. 91 (1984) .....................................................45

*Tague v. Louisiana*, 444 U.S. 469 (1980 ..........................................45, 47

*Taylor v. Alabama,* 457 U.S. 687 (1982) ..............................................26
*Wong Sun v. U.S.*, 371 U.S. 471 (1963)...........................................26, 29

## Statutes

28 U.S.C. § 1291 ...................................................................................2
28 U.S.C. § 2253 ...................................................................................2
28 U.S.C. § 2254 ........................................................... 1, 13, 16, 17, 51

# STATEMENT OF JURISDICTION

Jason Lee Keller is sentenced to death pursuant to the judgment of the Circuit Court of Harrison County, Mississippi. The judgment of conviction was entered on October 7, 2009. The sentence of death was entered on October 8, 2009.

On August 24, 2021, Keller filed his Petition for a Writ of Habeas Corpus in the United States District Court for the Southern District of Mississippi, under 28 U.S.C. § 2254. He filed a Second Amended Petition for Writ of Habeas Corpus on January 11, 2023. On September 23, 2024, the District Court denied federal habeas relief and dismissed Keller's petition with prejudice. ROA.1544-1798. It also denied a certificate of appealability ("COA"). *Id.* On December 29, 2024, the District Court denied Keller's Motion to Alter or Amend the Court's Order. ROA.1863-1872.

Keller timely filed a notice of appeal on January 17, 2025. ROA.1873-1874. This Court had jurisdiction to decide a COA application under 28 U.S.C. § 2253(c), and it partially granted that application on June 24, 2025. No. 25-70002 ("COA Order"). Specifically, it certified the appeal on the issue of "Whether the Trial Court failed to suppress the

1

final recorded statement elicited from Petitioner while he was in the Intensive Care Unit." (Doc. 39-1).

After granting COA, this Court has jurisdiction to decide the certified issue under 28 U.S.C. §§ 1291 and 2253(a).

# STATEMENT OF THE ISSUE

1. Whether the Trial Court erred in failing to suppress the final recorded statement elicited from Petitioner when he was in the Intensive Care Unit.

## STATEMENT OF THE CASE

Jason Lee Keller was convicted of capital murder and sentenced to death. ROA.2138. The conviction stems from the June 21, 2007, murder of Ms. Hat Nguyen, the proprietor of Food Mart, a convenience store on Popps Ferry Road in Biloxi, Mississippi. ROA.4248.

Around 11:30 p.m. on the night of the murder, Biloxi police spotted Keller in his stepfather's truck on the interstate, and a pursuit began. ROA.2224. Keller pulled off the interstate somewhere near the I-110 interchange. ROA.2225. When Keller exited the truck, police opened fire and shot him in the chest. *Id.* Keller was taken to the Emergency Room at Biloxi Regional Medical Center via ambulance where he arrived at 11:45 p.m. ROA.2195. Keller was accompanied by a police officer in the ambulance. ROA. 2225. It is undisputed that Keller was high on cocaine when shot by the police, remained high on cocaine well into his treatment in the ICU, and was given high doses of morphine while in the ER and ICU. ROA.3343-3348, 3358-3363, 3401.

There were no eyewitnesses to the June 21, 2007, murder of Ms. Nguyen. Nearly all the evidence the State relied on to establish that Keller was the person who had robbed and killed Ms. Nguyen, and the only direct proof of that point, was information police obtained from

Keller during three interrogations of him that the police conducted during the first 15 hours of a 10-day stay at Biloxi Medical Regional Center. ROA.2202, 2235-2236.

## Pre-Trial: Interrogation and Confession

These police interrogations began almost immediately after Keller arrived in the ER, while he was undergoing physically excruciating stabilization procedures, including placement of a chest tube. ROA.2200, 2209. The interrogations continued in the ICU, where Keller was moved after being stabilized in the ER. ROA.2236.

Investigator Michael Brown took Keller's second statement in the ER, and he took the third statement in the ICU. *Id.* Keller remained heavily sedated with physician-administered drugs while in the ICU, as he had been in the ER, and continued to test positive for cocaine in his system. ROA.3844. The police efforts resulted in three audiotaped statements, which Keller sought to have suppressed.

The trial court held an evidentiary hearing on the suppression motion. ROA.2195-2288. The hearing established that police began questioning Keller almost simultaneously with his arrival in the ER. ROA.2200, 2215. The interrogation was conducted first by Investigator

Craig Shows, and then by Investigator Mike Brown, both in the ER. ROA.2200, 2235. While Shows questioned Keller in the ER, minutes after arriving at the hospital, one of the investigators in the room told Keller "if you cooperate with us, we'll see what we can do" when Keller was "moaning and groaning for water." ROA.2217. After Shows' questioning, Investigator Brown questioned Keller sometime after one a.m. ROA.2236. Keller continued to moan in pain, and he asked if he could talk to the investigator later. ROA.2239. Investigator Brown returned to the hospital at 2:00 pm the next day because he wanted to see if Keller "could actually talk." ROA.2243. At this point, Keller was in the Intensive Care Unit. *Id.* Officer Brown read Keller his *Miranda* warnings, after reminding Keller that he had already agreed to talk to him: "I'd like to read you your rights. *I know you said you would agree to talk to us*, but I gotta do that anyway." ROA.3458.

The trial court suppressed the two statements given in the ER but admitted the statement from the ICU into evidence. The trial court found that Keller was "in a great deal of pain and distress" and "did not seem to be alert and/or aware of his surroundings" when he gave the recorded statements in the ER. ROA.4281-4282. In so holding, the trial court

6

implicitly rejected the testimony of law enforcement that Keller did not receive any treatment while they interrogated him, explaining that the records reflected that Keller "was receiving emergency room treatments for his gunshots, including the insertion of a chest tube" and that he was receiving pain medication, including morphine. ROA.3410. Regarding the ICU statement, the trial court reasoned that Keller had left the ER, the officer read his *Miranda* warnings, Keller responded he understood, and Keller sounded alert and did not seem to be in pain. The trial court concluded, there was "no evidence of coercion, pressure or promise of reward by the interrogating officer." ROA.2000.

## Trial and Direct Appeal

Keller's trial lasted less than two days, and the State called six witnesses. ROA.2182-2183. Three witnesses testified about coming upon the scene after the murder. None of these witnesses saw a suspect. ROA.2557-2561, 2573-2579, 2584-2591. The doctor who performed the autopsy testified. ROA.2617-2647. A witness from Keesler Credit Union testified that he obtained security footage of a customer exchanging coins for cash on the day of the murder (ROA.2610-2617), and Officer Brown was called to identify Keller in the footage. ROA.2651-2652. The only

direct evidence against Keller was the ICU statement, which was introduced through Officer Brown and played for the jury. ROA.2604. The jury returned a guilty verdict after 37 minutes. ROA.2183.

Keller appealed his conviction and sentence to the Mississippi Supreme Court. The Mississippi Supreme Court took the unusual step of remanding the case to the trial court for an evidentiary hearing related to the admission of Keller's third confession statement obtained in the Intensive Care Unit. On return from remand for the supplemental evidentiary hearing, the Mississippi Supreme Court affirmed Keller's conviction and sentence. *Keller v. Mississippi*, 138 So. 3d 817 (2014), ROA.4247-4354.

**Remand Hearing**

Dr. Joseph Jackson, a board-certified neurologist and psychiatrist with board certifications in neurology, psychiatry, pain management, and sleep disorders testified at the evidentiary hearing regarding Keller's condition while in the ICU. ROA.3156. Rather than leaning on a learned, qualified, and accepted expert in the field, the trial court, Mississippi Supreme Court, and the District Court seemingly discredited Dr. Jackson's testimony in favor of a non-medical-professional police officer

in concluding that Keller managed to give an intelligent, knowing, and voluntary confession in the ICU.

Of particular importance, Dr. Jackson testified that at the time of his third statement in the ICU:

> [Keller] had received at least 30, possibly 34 milligrams of morphine. He had not slept, of course. He still had cocaine in his system. I still would not have allowed him to give testimony. I wouldn't have allowed him to consent. So in my opinion, based on the way I think about things in terms of how we do it medically, he would have not been able to make a free and clear decision to either testify or not to testify.

ROA.3169. Put differently, based on his medical experience, Dr. Jackson did not believe that, based on a totality of the circumstances as they existed in the ICU, Keller could have made a free (voluntary, knowing, or intelligent) decision of whether to waive his rights and make a statement to the interrogating officer. Dr. Jackson also stated that, though Keller had improved in the ICU, he "*still remained confused. He still couldn't recall details . . . . And he was still under the effect of the high amounts of morphine, which lowers your ability to make those kinds of critical cognitive decisions.*" ROA.3169-3170 (emphasis added).

The State did not call an expert qualified to challenge the opinions of Dr. Jackson. Instead, the State elicited testimony from Dr. Gregory

Bredemeier, the emergency medicine physician who treated Keller in the

emergency room for the injuries subject to this inquiry. On cross-

examination, the following colloquy was had between Dr. Bredemeier and

counsel for Keller:

> Q.    I'm going to turn to the . . . line on the adverse drug
> reaction, possible side effects. And if you would look at the
> nervous system effects. Am I correct that mental clouding and
> depression are one of the nervous systems effects that are a
> known side effect or adverse reaction, as it were, of the drug
> morphine?
> A.    Yes, ma'am.
> . . .
> Q.    If you had received, over the course of 14 hours, 26
> to 30 milligrams of morphine for relief of pain which, in your
> view, was on a scale of 8 to 10, but had reduced to now
> between 2 and 5, would you report for work and work on
> patients with that much morphine being administered over
> that period of time prior to your reporting to work?
> . . .
> A.    I would not report to work with morphine on
> board.
> . . .
> Q.    Would you have advised Mr. Keller, while he was
> in the emergency room, to make any major decisions on
> business or legal matters?
>
> A.    *I would not have advised him to do that.*

ROA.3255-3258. (emphasis added).  In other words, since Keller had

received morphine for pain relief, Dr. Bredemeier opined that it was

unadvisable for Keller to make major decisions regarding his legal rights.

Approximately 11 hours after the last (and suppressed) ER statement, Investigator Michael Brown, interrogated Keller in the ICU. ROA.2243. Officer Brown was the interrogator during the second of the two suppressed statements taken in the Emergency Room. When Officer Brown elicited the third statement from Keller, he reminded Keller that he had previously desired to talk and stated: "I'd like to read you your rights. I know you said you would agree to talk to us, but I gotta do that anyway." ROA.3458. Keller responded, "I understand." *Id.*

The record is abundantly clear that Keller continued to be heavily sedated with physician-administered drugs, as he had been in the emergency room. When asked if anything would have carried over from the last interrogation in the ER to the interrogation in the ICU, Dr. Jackson testified that:

> [T]here was evidence that he was – during that time of feeling a need, basically, to state what he had felt, what had happened, but not necessarily with the clarity of thought that one would have if they were not under the influence of these medications and drugs.

ROA.3170. When asked: "And in your opinion, was that need, at least in part, the product of his medical condition and the prior interrogations

and the police, the manner in which the police questioned him during his

third statement?" Dr. Jackson, in response, testified that:

> There was no question he felt a relationship with the police
> officers at the time. There's no question, somewhere, not
> recorded on any of the tape, one of the police officers had
> talked to him about, you know, if you do this and go to jail,
> you know, you will have a place to stay, you will have a place
> to sleep. None of that is in the evidence, but he comments on
> it. So we know he's been talking to the officers. He has a
> relationship there. And he is trying very hard to please them.

ROA.3170-3171.

> Dr. Jackson also opined that:

> They helped lead him into making a statement . . .

> So there was a lot of restructuring of questions in a way that
> supposed information, which he had not, at that point, made.
> And then on times, never clearly made because he doesn't
> really seem during that interview to recall all of that in any
> accurate way.

ROA.3174. Dr. Jackson further opined that Keller was not competent to

understand the consequences of his making a statement to Officer

Brown. ROA.3175.

Dr. Jackson's testimony reinforces what the evidence reveals about

the extreme nature of Keller's physical and mental condition at the time

of his third statement. The Mississippi Supreme Court rejected the only

reasonable interpretation from the undisputed facts of Keller's condition

12

in finding that he could intelligently, knowingly, and voluntarily waive his *Miranda* rights in the ICU. *Keller*, 138 So. 3d at 854, ROA.4281-4294. The Mississippi Supreme Court held that while questioning a suspect who is being treated in the ER may be "questionable," there was "no evidence suggesting that the police officers did so to coerce Keller." *Id.* at 851, ROA.4285.

The Mississippi Supreme Court also held that circumstances surrounding the first and second statements had no bearing on the third statement, which was "sufficiently distinguishable." *Id.* at 852, ROA.4290.

## Post-Conviction Proceedings

Keller filed an application for post-conviction relief in the Mississippi Supreme Court on June 12, 2015. After an evidentiary hearing related to trial counsel's failure to investigate and discover mitigating evidence, the Mississippi Supreme Court affirmed the trial court's denial of post-conviction collateral relief on December 10, 2020. *Keller v. State*, 306 So. 3d 706 (Miss. 2020). Keller petitioned the District Court for relief under 28 U.S.C. § 2254, and the District Court denied

relief, also accepting that Keller made a knowing, voluntary, and intelligent waiver of his *Miranda* rights. ROA.1798.

## SUMMARY OF THE ARGUMENT

The admission of Keller's third statement to law enforcement was the most powerful piece of evidence against him at trial, and it should not have been admitted. The Mississippi Supreme Court's holding that the statement was admissible even though Keller made the statement while in the intensive care unit, under the influence and effects of physician-administered narcotics, and after two prior involuntary statements is an unreasonable application of clearly established Supreme Court precedent.

Keller's third statement was involuntary. Courts must look at the totality of the circumstances surrounding a statement to determine its voluntariness, and the state court's conclusion that there was no evidence of coercion in obtaining the third statement was unreasonable. Police overreaching and coercion can be in the form of taking advantage of a suspect's mental state and his circumstances and need not involve physical violence or threats. *Blackburn v. Alabama*, 361 U.S. 199, 206 (1960). There can be no question that law enforcement took advantage of

the circumstances surrounding the third interrogation, creating a coercive environment and rendering Keller's statement involuntary.

Additionally, Keller's third statement is "the fruit of the poisonous tree" and was impermissibly tainted by the prior unconstitutionally obtained statements. The testimony of the officer who obtained the third statement makes clear that the third interrogation was a continuation of the prior interrogations. Officer Brown, who obtained the second statement, returned to the hospital to interview Keller a third time and specifically testified that he returned "to see if he [Keller] still wanted to cooperate."

The three rounds of Keller's interrogation were part of a continuum, and the third interrogation, though warned, was a deliberate exploitation of the prior involuntary statements. *See Missouri v. Seibert*, 542 U.S. 600. 615-17 (2004). The Mississippi Supreme Court unreasonably applied Supreme Court precedent in concluding that *Seibert* was inapplicable simply because several hours had passed between the second and third interrogations. Keller was still in the hospital, and the interrogating officer reminded Keller that he had already agreed (during the prior unconstitutional interrogation) to talk to him. The officer did nothing to

dissuade Keller from the likely misimpression that his prior statements could be used against him.

Last, Keller did not make a valid waiver of his *Miranda* rights prior to giving the third statement. Keller was incapable of understanding his rights given his mental and physical condition when he gave the third statement.

Considering the totality of the circumstances surrounding Keller's questioning in the ICU, Keller's statement was involuntary, it was tainted by, and a product of, the two prior unconstitutional statements, and it was without waiver of his *Miranda* rights. To hold otherwise was an unreasonable application of established Supreme Court precedent.

# ARGUMENT

## Standard of Review

In this habeas corpus case, this Court applies the standards of review set forth in the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254. Under 28 U.S.C. § 2254(d)(1), a state court's decision is "contrary to" clearly established Supreme Court precedent, as would warrant federal habeas relief, if it applies a rule that contradicts the governing law set forth in Supreme Court cases. Additionally, a state

16

court "unreasonably applies" clearly established federal law, as would warrant federal habeas relief, if it identifies the correct governing principle, but unreasonably applies that principle to the facts of the case. §2254(d)(1). Under § 2254(d)(2), this Court may grant relief if the state court adjudication "resulted from a decision that was based on an unreasonable determination of facts in light of the evidence presented in the state court proceeding." In reviewing a district court's application of AEDPA, the Court of Appeals reviews the district court's findings of fact for clear error and its conclusions of law *de novo*. *Blanton v. Quarterman*, 543 F.3d 230, 235 (5th Cir. 2008).

## I.   Keller's third statement to law enforcement was involuntary.

The Mississippi Supreme Court unreasonably applied clearly established federal law in finding that Keller's third statement made in the ICU was voluntary. *Keller*, 138 So. 3d at 847-48, ROA.4281-4286; ROA.1708. Keller was incapable of giving a voluntary statement, and law enforcement used his fragile mental and physical state to coerce him into speaking. In holding otherwise, the Mississippi Supreme Court unreasonably applied clearly established Supreme Court precedent. *Miranda v. Arizona*, 384 U.S. 436, 464-65 (1964) (explaining that the

17

more coercive and inappropriate the police conduct in the illegal interrogation was the more likely it is that it actually did "disable [an individual] from making a free and rational choice" about speaking); *Blackburn v. Alabama*, 361 U.S. at 206.

"[C]oercion can be mental as well as physical, and [] the blood of the accused is not the only hallmark of an unconstitutional inquisition." *Blackburn*, 361 U.S. at 206 (citing *Chambers v. Florida*, 309 U.S. 227 (1940)). As such, "the range of inquiry in this type of case must be broad, and this Court has insisted that the judgment in each instance be based upon consideration of 'the totality of the circumstances.'" *Id.* (citing *Fikes v. Alabama*, 352 U.S. 191 (1957)). In *Blackburn*, the defendant argued that his confession was not voluntary because he was schizophrenic. *Id.* at 202. At the hearing to determine the statement's admissibility, the sheriff testified that "no one had threatened Blackburn in any way" to secure his confession. *Id.* While the sheriff testified that he knew Blackburn had been a patient in a mental institution, he also testified that during the interrogation, Blackburn "talked sensible and g[a]ve sensible answers, was clear-eyed, and did not appear nervous." *Id.* The confession was submitted to the jury. The Supreme Court reversed,

finding the confession involuntary and explaining that involuntariness can be a product of mental as well as physical pressure. *Id.* at 206. Specifically, the Court reasoned that while it was possible Blackburn was not insane at the time of his confession, his mental health issues made it probable that the confession was "not the product of any meaningful act of volition." *Id.* at 211.

The Supreme Court has further explained that while a defendant's mental condition is "surely relevant to an individual's susceptibility to police coercion, mere examination of the confessant's state of mind can never conclude the due process inquiry." *Colorado v. Connelly*, 479 U.S. 157, 165 (1986). In addition to mental condition, there is the "integral element of police overreaching." *Id.* Where the police are aware of the defendant's mental condition and exploit the weakness with coercive tactics, the resulting confession is involuntary. *Id.* In *Blackburn*, the police learned of the defendant's history of mental problems *and* exploited that with coercive tactics, including a sustained interrogation in a tiny room, the absence of friends, relatives or counsel, and the composition of the confession by the sheriff, not the defendant. *See Connelly*, 479 U.S. at 165 (distinguishing *Blackburn* from *Connelly* where the defendant was

schizophrenic but approached an officer and then confessed without any prompting after being read his *Miranda* rights).

Like in *Blackburn*, Keller's third statement was not the product of a meaningful act of volition, and the Mississippi Supreme Court's holding is contrary to Supreme Court precedent. The Mississippi Supreme Court found that coercion is necessary to find involuntariness, and the state court stated: "The officers did not intimidate or threaten him in any way. Their questioning was restrained." *Keller*, 138 So. 3d at 851, ROA.4288 (citing *Connelly*, 479 U.S. at 170). *Blackburn* establishes, though, that police overreaching and misconduct includes taking advantage of a suspect's mental state and the circumstances.

Here, like in *Blackburn*, the officers did not need to employ any physical coercion to obtain the third statement because the totality of the circumstances was coercive enough: Keller was still in the ICU after being near death; he was under the influence of morphine and cocaine; and he had already confessed and spoken with the officers at least twice before while in the ER. Unlike in *Connelly*, the officers here were aware of the extent of Keller's fragile physical and mental state and used that to their advantage to coerce a third statement. While they did not

20

"intimidate or threaten" Keller, they knew of his condition and took advantage of it by repeatedly questioning him in the hospital and referring to statements he made when he was in the throes of treatment in the ER.

At the evidentiary hearing before the trial court, Dr. Joseph Jackson testified regarding Keller's condition while in the ICU, noting Keller had received "at least 30, possibly 34 milligrams of morphine…had not slept… [and] still had cocaine in his system." ROA.3169.

Based on his medical experience, Dr. Jackson did not believe that, based on a totality of the circumstances as they existed in the ICU, Keller could have made a free (voluntary, knowing, or intelligent) decision of whether to waive his rights and make a statement to the interrogating officer. *Id.* Dr. Jackson testified that though Keller had improved in the ICU, he "*still remained confused. He still couldn't recall details . . . . And he was still under the effect of the high amounts of morphine, which lowers your ability to make those kinds of critical cognitive decisions.*" ROA.3169-3170. (emphasis added).

Dr. Jackson's testimony highlights that the officers capitalized on their prior unconstitutional interrogations in the ER when questioning

21

Keller in the ICU. Specifically, when asked if anything would have
carried over from the last interrogation in the ER to the interrogation in
the ICU, Dr. Jackson testified:

> [T]here was evidence that he was – during that time of feeling
> a need, basically, to state what he had felt, what had
> happened, but not necessarily with the clarity of thought that
> one would have if they were not under the influence of these
> medications and drugs.

ROA.3170. And when asked: "And in your opinion, was that need, at least
in part, the product of his medical condition and the prior interrogations
and the police, the manner in which the police questioned him during his
third statement?" Dr. Jackson, in response, testified:

> There was no question he felt a relationship with the police
> officers at the time. There's no question, somewhere, not
> recorded on any of the tape, one of the police officers had
> talked to him about, you know, if you do this and go to jail,
> you know, you will have a place to stay, you will have a place
> to sleep. None of that is in the evidence, but he comments on
> it. So we know he's been talking to the officers. He has a
> relationship there. And he is trying very hard to please them.

ROA.3170-3171.

> Dr. Jackson also opined that:

> They helped lead him into making a statement . . .

> So there was a lot of restructuring of questions in a way that
> supposed information, which he had not, at that point, clearly
> made. And then on times, never clearly made because he

doesn't really seem during that interview to recall all of that in any accurate way.

ROA.3174. Dr. Jackson further opined that Keller was not competent to understand the consequences of his making a statement to Officer Brown. ROA.3175.

Dr. Jackson's testimony reinforces the only reasonable interpretation of the undisputed facts about Keller's physical and mental condition. Dr. Jackson testified, based on the totality of the circumstances as they existed in the ICU, Keller could not have made a free decision of whether to waive his rights and make a statement to the interrogating officer. The unrefuted evidence establishes that the confession was not the product of any meaningful act of volition but was the product of coercion given his mental and physical condition and the effect of the prior unconstitutional interrogations.

In *Fikes v. Alabama*, 352 U.S. at 197, there was no physical brutality, and the Court held that "[t]he totality of the circumstances that preceded the confessions in this case goes beyond allowable limits." There, the accused was of low mentality, if not mentally ill; was removed from the jail to a state prison far from his home; was kept in isolation for a week, except for sessions of questioning; saw no friend or relative; and

his father and a lawyer were barred in attempts to see him. *Id.* The Court held that "[t]he totality of the circumstances that preceded the confessions in this case goes beyond the allowable limits. The use of the confessions secured in this setting was a denial of due process." *Id.*

Though law enforcement may not have resorted to physical violence, they did subject Keller to persistent interrogation in the ER while he was undergoing life-saving treatment for a police-inflicted gunshot wound to the chest, which included the insertion of a chest tube with only local anesthetic. Keller remained positive for cocaine during the interrogations, he was administered 30-34 milligrams of morphine before the third interrogation, and he had not slept. Dr. Jackson testified that he would not have allowed him to consent to giving a statement. *See* ROA.3169. In line with *Fikes* and *Blackburn*, "[t]he totality of the circumstances that preceded the confessions in this case goes beyond the allowable limits. The use of the confessions secured in this setting was a denial of due process." *Fikes*, 352 U.S. at 197.

Keller did not give a voluntary statement to the law enforcement. Like in *Blackburn*, the officers' conduct was coercive because they were well-aware of Keller's physical and mental condition and took advantage

24

of it. This was police misconduct. His statement in the ICU was coerced, given the totality of the circumstances of his interrogation. "[T]he circumstances of pressure applied against the power of resistance of this petitioner, who cannot be deemed other than weak of will or mind, deprived him of due process of law." *Fikes*, 352 U.S. at 197-98. Thus, the Mississippi Supreme Court made an unreasonable determination of law and fact in upholding the admission of Keller's statement given in the ICU.

## II.    The third statement is unlawful fruit of the poisonous tree.

The issue of the involuntary nature of Keller's third statement and the issue of that statement being the fruit of the poisonous tree are practically interwoven. Keller's third statement was impermissibly tainted by the first two involuntary statements. All three statements were obtained while Keller was hospitalized, under the influence of narcotics, and the third statement was a continuation of the first two interrogations. The Mississippi Supreme Court's conclusion that the third statement was "sufficiently removed from the first two statements to 'purge the primary taint'" was an unreasonable application of Supreme Court precedent. *Keller*, 138 So. 3d at 848-850, ROA.4282-4287.

Where the prior statements are involuntary due to unconstitutionally coercive police behavior, the admissibility of the subsequent one is governed by a variation of the "fruit of the poisonous tree" analysis established by *Wong Sun v. U.S.*, 371 U.S. 471, 488 (1963). *See also Taylor v. Alabama,* 457 U.S. 687, 690, (1982) and *Brown v. Illinois*, 422 U.S. 590, 602, (1975) (holding that a confession obtained after illegal or unconstitutional police conduct "should be excluded unless intervening events break the causal connection between the [unconstitutional conduct] and the confession so that the confession is sufficiently an act of free will to purge the primary taint.") (internal quotations omitted).

If the subsequent interrogation exploits the information received or the coercion exerted during the unconstitutional interrogation in obtaining the subsequent statement, the subsequent statement is tainted by the constitutional violation and is also inadmissible. *Seibert*, 542 U.S. at 615-17; *Michigan v. Tucker*, 417 U.S. 433, 446 (1974).

The trial court recognized the severity of the police overreaching in holding the ER statements inadmissible. The facts as set forth in the trial court's order on the suppression motion illustrate the physical and

emotional incapacity Keller experienced, and the improper conduct by

the police officers interrogating him:

> . . . Two of the statements were recorded while Keller
> was receiving emergency room treatment for his gunshots,
> including the insertion of a chest tube. The recordings reveal
> Keller's immense pain with much moaning and groaning. The
> records also reflect that he was positive for cocaine by history
> and was receiving pain medication including morphine while
> in the ER.
>
> The first statement was taken by Investigator Shows. . .
> . At some point while Inv. Shows was interrogating Keller,
> Biloxi Police Department Investigator Perry brought a
> recorder into the ER. The tape begins with Inv. Shows
> continuing to question Keller and within minutes an
> abbreviated Miranda warning is quickly recited after which
> Inv. Shows continues to question Keller who is obviously in
> much pain and distress. Much of this recording is inaudible
> due to Keller's distress, his moans and groans, and the
> activities of the medical personnel as they prepare to insert a
> chest tube. There was no testimony from medical personnel
> that officers had received permission to question Keller or
> that his medical condition was such that he could knowingly
> waive his right to remain silent or to have an attorney present
> during questioning.
>
> ***
>
> The second recorded statement was taken by Officer
> Brown approximately thirty minutes after the first
> statement. No Miranda warning is given. It is obvious that
> Keller's pain was increasing as the moans and groans increase
> in volume and frequency. Officer Brown had to repeatedly call
> Keller's name, repeating his questions numerous times before
> receiving any response from Keller. It appears obvious that
> Keller is not alert and is barely aware of what is happening.

ROA.1999-2002.

In finding these facts, the trial court necessarily rejected as patently untrue significant portions of the testimony given by the interrogating officers at the suppression hearing. For example, one officer testified that no medical treatment was conducted of Keller during the time Keller was being questioned. ROA.2203-2215, 2266 The trial court rejected this assertion based on the tape recordings and the ER records, which clearly established that significant treatment, including administration of powerful medications and placement of a chest tube, were ongoing throughout the interrogation. ROA.2001. The trial court also expressly found, contrary to the officer's testimony, that the pain suffered by Keller during this treatment was part of the totality of the circumstances making his statements involuntary. *Compare* ROA.2203 (officer's testimony) *with* ROA.1999-2002 (trial court's holding).

Similarly, two other officers testified that throughout their questioning of him in the ER, Keller was not in significant pain or distress, and was appropriately lucid and responsive to their *Miranda* warnings and their substantive questions, notwithstanding that both the medical records and their own tape recordings, establish just the

28

opposite, and the trial court expressly so found. ROA.2202 (Shows), ROA.2227-2228 (Allen), ROA.1999-2002.

The trial court specifically determined that Keller had been deprived of two separate constitutional rights by improper and coercive police overreaching during their initial contacts him. As a matter of law, under those circumstances any subsequent statement is "the fruit of the poisonous tree" of that unconstitutionality, and is likewise inadmissible. *Seibert*, 542 U.S. at 615-17 (2004); *Tucker*, 417 U.S. at 446. But the trial court and Mississippi Supreme Court determined the third statement was "freely and voluntarily given and sufficiently removed from the first two statements to 'purge the primary taint'" *Keller*, 138 So. 3d at 848, ROA.4282 (citing *Wong Sun*, 371 U.S. at 486). This conclusion was an unreasonable application of Supreme Court precedent and an unreasonable determination of facts.

Indeed, in the instant matter, both an unbroken causal connection between the two involuntary statements and the ICU statement, and exploitation of the products of the involuntary statements in the ER, are established by the interrogating officer's own testimony. Officer Brown conducted both the second ER interrogation and the one in the ICU, and

conceded both causal connection and exploitation. When asked why he went in for the third statement, the following colloquy was had with Brown:

> Q:    All right.  What was the purpose of going back and getting this statement from Mr. Keller?
>
> A.    Well, I wanted to go back and see if, you know, we could get a better statement when he wasn't in as much pain, he could actually talk. *And he did say he wanted to cooperate. And that's what we went back for, to see if he **still** wanted to cooperate.*

ROA.2243. (emphasis supplied).

The officer's self-admitted reliance on that statement as the basis for resuming the interrogation directly imports the taint from the first interrogations to the final one. Moreover, the ICU interrogation exploits not only the unconstitutionally extracted agreement to cooperate elicited during the second ER interrogation, but also the substantive information involuntarily obtained from Keller during both ER interrogations. Under these circumstances, the trial court's *sui generis* analysis of the third statement was an unreasonable application of clearly established Supreme Court precedent.

The same investigator questioned Keller in the ER and the ICU, with about 11 hours between the interrogations.  When asked if anything

would have carried over from interrogation to interrogation, Dr. Jackson

testified that:

> He seemed even more eager to try to please the officer. He
> made some comments during the tape about the fact that he
> would be off the street and he would be able to eat regularly or
> something like that. You know, there were all kinds. And then,
> of course, he said, did I do a good job, or something similar to
> that. Did I give you everything, you know. It's the whole truth,
> you know. He said that at the end. It was clear he was trying
> to ingratiate himself. At one point he had cried about the
> person who he had shot, you know.

> So, there was evidence that he was – during that time of feeling
> a need, basically, to state what he had felt, what had happened,
> but not necessarily with the clarity of thought that one would
> have if they were not under the influences of these medicines
> and drugs.

ROA.3170.

At the remand hearing, Keller's counsel asked Dr. Jackson: "And in

your opinion, was that need, at least in part, the product of his medical

condition and the prior interrogations and the police, the manner in

which the police questioned him during this third statement?" To which,

Dr. Jackson stated:

> There was no question he felt a relationship with the police
> officers at that time. There's no question, somewhere, not
> recorded on any of the tape, one of the police officers had
> talked to him about, you know, if you do this and go to jail,
> you know, you will have a place to stay, you will have a place
> to sleep. None of that is in evidence, but he comments on it.

So we know he's been talking to the officers. He has a relationship there. And I think he is trying very hard to please them.

ROA.3170-3171.

When asked whether he had an observation about who was providing information to and provoking responses from Keller about the shooting of the victim, the sequence of the shooting, the number of shots, and the like, Dr. Jackson stated that:

> Because it did seem at the beginning, he [Keller] said very clearly he had shot twice, then the officer says something about it being one time, and then the next time he [Keller] says, well, once or twice. And then, of course, they give him more medicine and he is really at this point not sure when things happened, how they happened. The officers restructure it again for him, he responds basically the way they've restructured it, you know. There then is the clerk – the young woman who goes out of the store, he follows her, you know, she comes back in the store. There is this discussion about how she happens to fall down, which he doesn't seem to have any understanding of or any of that kind of information in all that structure. They talk about when he did what must have been the final shot to the head. And they basically give him the information on where he was standing and, therefore that he had to be where he was shooting because he didn't know. You know, he at no time knew how many times he had shot her, possibly three, possibly four. He knew there were five bullets, you know. He didn't know what he did with the bullets later. They helped lead him into making a statement on that, too.
>
> So there was a lot of restructuring of questions in a way that supposed information which he had not, at that point, clearly

32

made. And then on times, never clearly made because he doesn't really seem during that interview to recall all of that in any accurate way.

ROA.3173-3174.

Keller's counsel asked and Dr. Jackson answered:

Q.    And would that have been another susceptibility level, the emotional state he was under and the fact of having been shot by these same people who were interrogating him, or by a representative from the same agencies, would that have added to his susceptibility to be overborne – strike that.

With this, in that mental state, would that be – would he be able, as a matter of – would he be able to make the kind of rational decision with respect to waiving his rights and giving up his rights and giving up his rights that he might otherwise may – or a person not in that medical and physical state be able to make?

A.    As I think I answered, it is my opinion that he was in a state where he was more susceptible. He was at a point where he thought he was dying or going to die, you know. He had pretty much accepted that was going to happen. Maybe even encouraged it, you know. He still is under the influence of a significant amount of cocaine, you know. And I don't think anyone can make a rational decision in that circumstance.

Again, I fall back on my standard, would he be competent to be able to make a decision understanding its consequences, and the answer to that is much easier than these questions, which is no, he would not.

ROA.3178-3179.

It was an unreasonable application of Supreme Court precedent to find that the unconstitutional ER statements were not important to the

33

analysis of the third statement. And likewise, it was an unreasonable application of Supreme Court precedent to determine that the ER statements did not render the third statement the fruit of the poisonous tree under *Oregon v. Elstad*, 470 U.S. 298, 308 (1985). As a matter of law, the circumstances of the prior unconstitutional activities and any possible residual taint are the most significant matters to be considered in determining this question.

Dr. Jackson alluded that Keller was trying to ingratiate himself with the officers, which continued from his treatment in the ER into his treatment in the ICU. In other words, Keller made up the content of his "statement" based upon the leading of nature of the questioning of the investigators, which began during his treatment in the ER.

The trial court correctly determined that Keller was deprived of his constitutional rights by the improper and coercive police overreaching during the emergency room treatment. But it should have found that the third statement is "the fruit of the poisonous tree" of the unconstitutionality of the behavior in the ER, and is likewise inadmissible. *Seibert*, 542 U.S. at 615-17; *Tucker*, 417 U.S. at 446.

Clearly established law provides that only where the prior statements are free from constitutional error may a new and separate analysis of the circumstances of the subsequent statements be undertaken without reference to the prior statements. *See Elstad*, 470 U.S. at 308. There was no intervening event which may be sufficient to break the causal connection between the ER statements and the ICU statement so that the confession is sufficiently an act of free will to purge the primary taint.

Keller's conviction and sentence have been allowed to stand upon statements made and admitted as a violation of the fruit of the poisonous tree, or a variation thereof.

## III.  Keller's third statement was the product of a deliberate exploitation of a prior *Miranda* violation.

The same officer who questioned Keller in the emergency room used the coercion tactic of exploiting the prior *Miranda* violations to secure the third statement in the intensive care unit. The Mississippi Supreme Court's and Distrct Court's upholding of admission of the third statement involved an unreasonable application of clearly established Supreme Court precedent and involved an unreasonable determination of facts.

## A. The state court unreasonably failed to apply *Missouri v. Seibert*.

Officer Brown employed a systematic interrogation technique designed to exploit the prior *Miranda* violations. When by objective means a police strategy is adapted to undermine *Miranda* warnings, the statement should be suppressed. *Seibert*, 542 U.S. at 616 (2004). Such objective means include mental coercion. *Blackburn*, 361 U.S. at 206. Because mental coercion can come in many forms, the Supreme Court has admonished that "the range of inquiry in this type of case must be broad, and this Court has insisted that the judgment in each instance be based upon consideration of 'the totality of the circumstances.'" *Id.* (quoting *Fikes*, 332 U.S. at 197).

In *Seibert*, the Court held that a warned phase of questioning following an unwarned interrogation was inadmissible. 542 U.S. at 616-17. In that case, the officer engaged in an unwarned interrogation at the station that was "systematic" and "exhaustive." Thereafter, in the same location, the same officer began the warned phase of questioning 15 or 20 minutes after the unwarned interrogation. *Id.* While the officer gave a *Miranda* warning, he did not advise Seibert that her prior statement could not be used. *Id.* He also "said nothing to counter the probable

misimpression that the advice that anything Seibert said could be used against her also applied to the details of the inculpatory statement previously elicited." *Id.* at 616.

The Court held that under these facts, the officer exploited the prior unwarned confession to obtain the warned confession. The Court explained that the exploitation was evidenced by the officer harkening back to the prior unwarned admission. Specifically, the officer stated, "we've been talking for a little while about what happened…haven't we?" By referring to the prior questioning, and by saying nothing to inform her that the prior questioning would be inadmissible, the officer deliberately created an impression that the two sessions were part of a continuum. *Id.* The statement obtained after the *Miranda* warning therefore deliberately exploited the prior questioning. Ultimately, the Court held that the impression that the warned questioning was a mere continuation of the earlier questioning "must be seen as challenging the comprehensibility and efficacy of the *Miranda* warnings to the point that a reasonable person in the suspect's shoes would not have understood them to convey a message that she retained a choice about continuing to talk." *Id.*

Here, the Mississippi Supreme Court and the District Court's decisions involved an unreasonable application of Supreme Court precedent in failing to apply *Seibert* given the officer's deliberate exploitation of a prior *Miranda* violation. The Mississippi Supreme Court held that *Seibert* did not apply because in its "opinion," *Seibert* can only apply to a single-interview scenario. *Keller*, 138 So. 3d at 849, ROA.4285. *Seibert* has no such requirement, and it established the principle that if the officer is exploiting a prior statement, a later *Miranda* warning is ineffective. *Seibert*, 542 U.S. at 617. The facts of this case need not align perfectly with *Seibert* because "[g]eneral legal principles can constitute clearly established law for purposes of AEDPA so long as they are holdings of [the Supreme Court]." *Andrew v. White* 145 S. Ct. 75, 82 (2025). Indeed, "certain principles are fundamental enough that when new factual permutations arise, the necessity to apply the earlier rule will be beyond doubt." *Id.*

The holding from *Seibert* is well-established: If an officer exploits a prior involuntary statement to secure a warned statement, the warned statement is inadmissible. The facts need not be identical for this holding to apply, and the principle applies here. Because the officers employed a

two-step interrogation strategy, the Mississippi Supreme Court and District Court's rejection of *Seibert* in this instance and its analysis instead under *Oregon v. Elstad*, 470 U.S. 298 (1985) was contrary to Supreme Court precedent.

### B. The state court attempt to distinguish *Missouri v. Seibert* involved an unreasonable determination of facts.

The Mississippi Supreme Court relied on an unreasonable determination of facts in attempting to distinguish *Seibert*. The controlling facts in *Seibert* included the following: the prior statement and the warned statement both occurred in the station house; the prior statement left little unsaid regarding the suspect's guilt; the warned phase occurred after a pause of 15 to 20 minutes; the same officer who conducted the first phase of questioning conducted the second phase; the officer said nothing to counter the likely misimpression that the prior statement could be used against her; nothing was done to explain why she was warned of her rights to silence after she had already been led through an interrogation; and the officer specifically stated, "we've been talking…about what happened…haven't we?" *Seibert*, 542 U.S. at 616. The Court focused in particular on the "references back to the confession already given." *Id.*

The Mississippi Supreme Court's finding that the "police approached the interview anew without relying on anything revealed in the first two interrogations" is inconsistent with the record given the officer's reference to the prior statement. And its ultimate conclusion that "[n]othing in the record supports a theory that the statements made in Keller's two suppressed interrogations were exploited to secure a subsequent confession" is an unreasonable determination of the facts. *Keller*, 138 So. 3d at 851, ROA.4286. Here are the facts:

- Keller's first statements left nothing unsaid about his potential guilt. Officer Shows testified Keller admitted to having "killed the lady," and even gave information about the location of the gun used. *Compare* contents of ICU statement, ROA.3458 *with* ROA.2206-2208 (testimony Shows) and ROA.2239 (testimony of Brown that Keller was answering his questions during second ER interrogation).

- Officer Brown approached Keller for his third statement and started by referencing back to the prior confession and Keller's agreement to talk to them: "I'd like to read you your rights. *I know*

*you said you would agree to talk to us*, but I gotta do that anyway."
ROA.3458 (emphasis added).

- Keller made his first two involuntary statements in the hospital and was still in the hospital, indeed in the *Intensive Care Unit*, and under the influence of narcotics when he made the third statement. *Id.*

- The same officer who took the second, suppressed statement took Keller's third statement.

- When taking Keller's third statement, the officer did nothing to correct Keller's likely misimpression that the prior statement, which the officer referenced, could be used against him.

The Courts have relied heavily on the officer's testimony that there was "no tactic used to get a statement," and they were "focused on getting as much information from Mr. Keller in that brief time." ROA.1698. This self-serving testimony does nothing to dispel the officer's specific reference to the prior statement where he reminded Keller that he had agreed to speak to him. And it does not dispel that he did nothing to dissuade Keller of the likely misimpression that the prior statements

could be used against him.[1] Moreover, the officer testified that the purpose of going back for the third time was to see if Keller *"still wanted to cooperate."* ROA.2243 (emphasis added).

The Mississippi Supreme Court and District Court also focus on the time lapse between the suppressed statements and the third statement. As discussed above, *Seibert* does not require that the statements be taken in rapid succession. Indeed, the more coercive and inappropriate the

---

[1] It is also notable that one of the officers testified during the suppression hearing that no medical treatment was conducted when he was questioning Keller. This was obviously contrary to the tape recordings and ER records, which clearly established that significant treatment, including placement of a chest tube and administration of powerful medications occurred during the interrogation:

*Compare* direct examination of BPD Inv. Craig Shows at ROA.18:

> A: . . .[H]e was not being treated by anybody when I was conducting my interview . . . . I know during the time that I was there, Mr. Keller was not administered any medications and was not being actively treated by anybody to do with Biloxi Regional."

*With* ROA.3343, 3358-3363 (itemizing placement of catheter, chest tube, administration of several doses of morphine during time in ER), *and* with trial court's Order suppressing at ROA.3410:

> Two of the statements were recorded while Keller was receiving emergency room treatment for his gunshots, including the insertion of a chest tube. . . . The records also reflect that he . . . was receiving pain medication including morphine while in the ER.

The Mississippi Supreme Court and District Court should not have placed such reliance on the officer's testimony that they were not using a "tactic" to get the third statement given the officer's willingness to frame his testimony to avoid suppression. Relying on this testimony was an unreasonable determination of facts. *See Blackburn*, 361 U.S. at 208-09 (holding that a confession was "not the product of any meaningful act of volition" in part because the prosecution doctor's testimony was in "hopeless internal conflict.").

police conduct in the unconstitutional interrogation was, the more likely
it is that it actually did "disable [an individual] from making and free and
rational choice" about speaking. *Miranda*, 384 U.S. at 464-65. Here, the
prior statements were extremely coercive – they exploited Keller's lack of
coherence and concentration due to medical treatment and excruciating
pain. And though the third statement occurred 11 hours later, Keller was
heavily medicated during that time period. ROA.3676, 3694 (showing
continuing administration of morphine in ER and ICU). He also
continued to have so much cocaine in his system that it turned up on a
urinalysis collected from him nearly three days after the ICU statement
was given. ROA.3839. It was an unreasonable determination of facts and
involved an unreasonable application of Supreme Court precedent to
conclude that the officer could not have deliberately exploited the two
prior unconstitutional questionings to obtain the warned statement after
the passage of 11 hours.

Likewise, *Seibert* is not rendered inapplicable because Keller may
not have been as heavily sedated and was not actively receiving life-
saving medical treatment during the officer's third round of questioning.
Keller was still in the hospital; Keller was still under the effects of

morphine; and law enforcement had exploited his vulnerabilities to elicit incriminating statements. *Compare with Bobby v. Dixon*, 565 U.S. 23, 32 (2011) (holding there was no deliberate "two-step interrogation technique" because between the unwarned and warned interrogation, Dixon had traveled from the police station to a separate jail and back again; he claimed to have spoken with his lawyer; Dixon had learned police were talking to his accomplice and had found the victim's body; and Dixon had denied involvement during the unwarned questioning as opposed to leaving "little, if anything, of incriminating potential left unsaid." (quoting *Seibert*, 542 U.S. at 616-17)).

The officers here deliberately exploited Keller's prior statements to obtain the third statement. To hold otherwise was an unreasonable application of Supreme Court precedent and involved an unreasonable determination of the facts.

## IV.    Keller did not make a valid waiver of his *Miranda* rights.

Even if this Court were to determine that the third statement was not unconstitutionally obtained as fruit of the poisonous tree, the conclusion that Keller made a new and valid *Miranda* waiver, is an

unreasonable application of Supreme Court precedent and an unreasonable determination of facts.

As a patient in the ICU and given the attendant circumstances, Keller was incapable of waiving his *Miranda* rights. A valid Miranda waiver of the right to silence and to counsel has two components – an "adequate warning" to the suspect that he has those rights, and a voluntary and intelligent waiver of those rights by him. For the warning to be an adequate precursor to the requisite "intelligent" waiver, the warning cannot simply be rattled off by the officer. It must also have been heard and understood by the suspect. *Edwards v. Arizona*, 451 U.S. 477, 486 (1981).

For a statement to be admissible against Keller, he must give a knowing and voluntary waiver of both his Fifth Amendment right to remain silent and his Sixth Amendment right of access of counsel. *Miranda*, 384 U.S. at 479. Courts must indulge "every reasonable presumption against" waiver and resolve ambiguities against a finding of waiver. *See Tague v. Louisiana*, 444 U.S. 469, 470 (1980); *Illinois v. Allen*, 397 U.S. 337, 343 (1970); *Smith v. Illinois*, 469 U.S. 91, 97 (1984). The statement must also be freely and voluntarily given in compliance

with the Fourteenth Amendment. *Jackson v. Denno*, 378 U.S. 368, 386-87 (1964). Involuntary statements cannot be used for impeachment or any other purpose by the prosecution at trial. *New Jersey v. Portash*, 440 U.S. 450, 459 (1977), *Mincey v. Arizona*, 437 U.S. 385, 398 (1978) (excluding statement taken during hospital because "any criminal trial use against a defendant of his involuntary statement is a denial of due process of law"). The prosecution must prove voluntariness beyond a reasonable doubt. Voluntariness turns solely on the circumstances surrounding the confession and not the probable trustworthiness of the statement. *See Rogers v. Richmond*, 365 U.S. 534, 540-44 (1961); *Denno*, 378 U.S. at 376-77, 383-86.

Officer Brown advised Keller of his *Miranda* rights prior to Brown's resuming the interrogation in the ICU, but never actually asked Keller to waive them, either orally or in writing. ROA.3458. Hence waiver must be inferred, and only after "the trial court . . . considers whether there is evidence to support the conclusion that, from the whole course of questioning, an express or implied waiver has been established." *Berghius v. Thompkins*, 560 U.S. 370, 388 (2010). The transcript of Keller's questioning in the ICU and his medical circumstances at the time

of the questioning demonstrate that Keller could not unambiguously waive his *Miranda* rights.

### A. The holding that Keller waived his *Miranda* rights before giving the third statement is contrary to Supreme Court precedent.

The District Court and Mississippi Supreme Court's conclusion that Keller waived his *Miranda* rights are contrary to established Supreme Court precedent holding that courts must indulge "every reasonable presumption against" waiver and resolve ambiguities against a finding of waiver. *Tague*, 444 U.S. at 470. It is incumbent on the officer delivering the *Miranda* warning to ensure the individual is capable of understanding his rights. *Id.* at 469-70 (holding waiver invalid where officer could not say yes or no to whether he determined if petitioner was capable of understanding his rights). The Mississippi Supreme Court and District Court concluded that even if Keller's response to the warning ("I understand") was not an express waiver, Keller's demeanor and responses conveyed waiver. *Keller*, 138 So. 3d at 854, ROA.4294; ROA.1709. Further, the Mississippi Supreme Court relied on the trial court's finding that Keller sounded alert on the recording of the third statement, concluding that "[w]here the trial court has resolved the issue of admissibility of a confession against a defendant, the Court generally

47

affirms, even when that finding is decided on conflicting evidence." *Id.* (citing *Lesley v. State*, 606 So. 2d 1084, 1091 (Miss. 1992)).

Contrary to Supreme Court precedent, these courts resolved all ambiguities in favor of waiver. They interpreted "I understand" to be an express waiver, and relied on the trial court's conclusion while recognizing there was "conflicting evidence."

### B. The conclusion that Keller voluntarily waived his *Miranda* rights was an unreasonable determination of the facts.

Considering the totality of the circumstances surrounding Keller's questioning in the ICU, Keller was incapable of understanding and waiving his *Miranda* rights. In upholding the admission of the third statement, the Mississippi Supreme Court relied on the officer's testimony that Keller "appeared coherent and alert when answering questions." And the District Court likewise noted that Keller's "demeanor was cooperative throughout the interview" and "he expressed remorse for his actions." ROA.1710. These courts' recitation of those facts disregards *expert* testimony that Keller was incapable of consent.

As discussed above, at the remand evidentiary hearing regarding the admissibility of the third statement, Dr. Jackson testified that Keller had received significant amounts of morphine, was sleep deprived, had

cocaine in his system, and would have been unable to make a "free and clear decision" regarding waiver. ROA.3169. When asked specifically about the observation that Keller was more coherent than when questioned in the ER, Dr. Jackson explained that though he was "better," he remained confused and his ability to make critical decisions was affected. ROA.3169-3170.

The Mississippi Supreme Court made an unreasonable factual determination in light of this unrebutted medical testimony that Keller was under the influence of so much pain medication that he was confused, and his ability to make critical, cognitive decisions was inhibited. Indeed, Dr. Jackson specifically addressed the deciding factor for the District Court and Mississippi Supreme Court that Keller sounded "alert and coherent." Dr. Jackson testified that even so, Keller would have struggled to make critical decisions. The Mississippi Supreme Court and District Court's factual determination was unreasonable.

## III. The failure to suppress Keller's third statement was not harmless.

The Mississippi Supreme Court and District Court did not reach this analysis, but by far the most damaging piece of evidence at Keller's

trial was the admission of guilt contained in his third statement. Indeed, Keller's third statement was the only direct evidence of his guilt. "[C]onfessions have profound impact on the jury." *Bruton v. United States*, 391 U.S. 123, 140 (1968) (White, J., dissenting)). *See also Arizona v. Fulminante*, 499 U.S. 279, 292 (1991) ("a confession is probably the most probative and damaging evidence that can be admitted against [a defendant]").

None of the State's witnesses (other than the officer to whom Keller made his third statement) testified about the identity of the suspect and no one saw Keller at the scene. *See* ROA.2558-2594, ROA.2617-2647. Officer Brown testified that he had received "a lot of phone calls …indicating that he [Keller] may be a suspect in the case." ROA.2598. He then testified that he took Keller's statement, and the statement was played for the jury. ROA.2604. A witness from Keesler Federal Credit Union testified that he obtained a video showing a customer exchanging coins for cash on the date of the crime, and that video was introduced into evidence. ROA.2615-2616. Officer Brown was recalled to the stand and identified Keller as the customer in the Keesler footage as the person exchanging rolled coins. ROA.2651. This was the sum total of the

evidence identifying Keller as the suspect. Without Keller's statement to Officer Brown being played for the jury, there was no direct evidence against him committing the murder or robbery.

The Supreme Court has "established that the Fourteenth Amendment forbids 'fundamental unfairness in the use of evidence whether true or false.'" *Blackburn*, 361 U.S. at 206. The Supreme Court has "rejected the argument that introduction of an involuntary confession is immaterial," and this is true even where "other evidence establishes guilt or corroborates the confession." *Id.* Keller's third statement had substantial and injurious effect on the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619 (1993). Its admission was not harmless.

## CONCLUSION

Keller's third statement to law enforcement should not have been admitted. Its admission was a violation of Keller's Due Process rights under the United States Constitution. Keller is entitled to habeas relief under 28 U.S.C. § 2254(d). Petitioner respectfully asks this Court to reverse and remand this case to the District Cout to grant the claim in the habeas petition regarding the admission of Keller's third statement.

Respectfully submitted,

S/ *CAROLINE K. IVANOV*

Caroline K. Ivanov (MSB No. 104215)
WATKINS & EAGER PLLC
400 East Capitol Street (39201)
Post Office Box 650
Jackson, Mississippi 39205
Phone: (601) 965-1900
Fax: (601) 965-1901
civanov@watkinseager.com

Brandi Denton Gatewood (MSB No. 103550)
MISSISSIPPI OFFICE OF CAPITAL
POST-CONVICTION
239 Lamar Street, Suite 404
Jackson, MS 39201
Phone: (601) 359-5733
Fax: (601) 359-5050
bgatewood@pcc.state.ms.us

*Counsel for*
JASON KELLER

# CERTIFICATE OF SERVICE

I hereby certify that I have caused this brief to be served on all

parties requesting notice by using the ECF filing system of the court.

This  the 3rd  day of September, 2025.

s/ *Caroline K. Ivanov*

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7) and contains 11,199 words total, including the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Fifth Circuit Rule 32.2.

2.  This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Century font.

*s/ Caroline K. Ivanov*